IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

BRIAN LEGGETT and BRYSON HOLDINGS,
LLC,

       Petitioners,

vs.

WELLS FARGO CLEARING SERVICES, LLC
d/b/a WELLS FARGO ADVISORS, LLC
and JAY WINDSOR PICKETT III,

       Respondents.

Civil Action File No.
  2019CV328949

## ORDER GRANTING MOTION TO VACATE ARBITRATION AWARD AND DENYING CROSS MOTION TO CONFIRM ARBITRATION AWARD

This case comes before the Court on Petitioners' Motion to Vacate Arbitration Award and Respondents' Cross Motion to Confirm Arbitration Award. Based on the Court's review of the record, including the transcript of the arbitration hearing, and a multi-hour hearing on November 9, 2021, which provided all parties the opportunity to present their evidence and arguments, the Court enters the following Order.

### Background

This case is about a dispute between Petitioners Brian Leggett and Bryson Holdings, LLC (the "Investors"), their brokerage firm, Wells Fargo Clearing Services, LLC, d/b/a Wells Fargo Advisors, LLC ("Wells Fargo"), and one of Wells Fargo's brokers, Jay Windsor Pickett III ("Pickett") over losses the Investors incurred on their investments at Wells Fargo. The parties arbitrated their dispute

before a Financial Industry Regulatory Authority ("FINRA") arbitration panel, and the Investors lost. The Investors now ask the Court to vacate the Award; Wells Fargo asks the Court to confirm it.

**Events Giving Rise to the Arbitration**

The record shows that the Investors were securities customers of Wells Fargo. During 2015 and 2016, the Investors sustained losses totaling $1,178,446.78 investing in a merger arbitrage strategy executed by their Wells Fargo broker Jacob McKelvey. Between April 2015 and May 2016, McKelvey managed the Investors' accounts. The Investors alleged that Wells Fargo permitted the account to be over-concentrated in single stocks and industries. McKelvey encouraged this activity, telling Leggett at one point that he should "[G]et all you can, back the truck up."[1] After suffering major losses and complaining to the firm, the Investors were provided a new broker, Pickett, who managed the accounts between April 2016 and November 2016.

Wells Fargo's customer agreement contained a binding arbitration agreement ("Arbitration Agreement") mandating arbitration at FINRA pursuant to the FINRA Code of Arbitration Procedure.[2] The Arbitration Agreement does not contain any

---

[1] Petitioners' Brief, Ex. A, Transcript, pp. 72-73.
[2] *Id.*, Ex. B.

fee/cost shifting provision requiring the losing party to pay the attorneys' fees or costs incurred by the prevailing party.[3]

The record shows that the Investors became increasingly concerned that Wells Fargo mishandled their accounts. Thereafter, the Investors initiated arbitration. The Investors asserted a number of claims against Wells Fargo and Pickett including violation of the Georgia Securities Act, failure to supervise, and breach of fiduciary duty.

**Arbitrator Selection**

The parties set about selecting arbitrators in accordance with the Arbitration Agreement. Pursuant to the Arbitration Agreement, the parties contractually agreed to select arbitrators pursuant to FINRA Code of Arbitration Procedure Rule 12400 ("Neutral List Selection System and Arbitrator Rosters"). That Rule provides that "[t]he Neutral List Selection System is a computer system that generates, on a random basis, lists of arbitrators from FINRA's rosters of arbitrators for the selected hearing location for each proceeding. The parties will select their panel through a process of striking and ranking the arbitrators on lists generated by the Neutral List Selection System."

---

[3] Petitioners' Brief, Ex. B.

On June 20, 2017, FINRA provided the parties with its list of proposed arbitrators generated by the Neutral List Selection System and requested the parties submit their ranking lists by July 10, 2017, which was extended by agreement of counsel to July 14, 2017. Rather than ranking and striking pursuant to the Code, on July 10, 2017, counsel for Wells Fargo submitted a letter to FINRA insisting that one of the proposed arbitrators on the list of potential arbitrators be removed from the computer generated list on the ground that he harbored personal bias against Wells Fargo's lead counsel, Terry Weiss.[4] The alleged bias resulted from a previous case (outside) counsel Weiss had worked on (and lost) for another FINRA member firm in which Weiss filed an unsuccessful motion to vacate alleging arbitrator misconduct.[5]

The Investors insisted that FINRA follow the procedure set forth in the Code which the parties had contractually agreed to follow:

> *Respondents do not provide any evidence whatsoever that this potential arbitrator is biased against or conflicted with any of the Respondents. The sole basis of the request is that years ago, Respondents' counsel, on behalf of another client, sought to have an arbitration award vacated on the ground that the arbitrator was biased.*
>
> *What Respondents fail to state, however, is that in that case a federal judge denied the motion to vacate, specifically rejecting the argument that the arbitrator exhibited evident partiality or misbehaved. See October*

---

[4] Petitioners' Brief, Ex. E.
[5] *Id.*

*25, 2012 Order Denying Motion to Vacate attached hereto
as Exhibit A.*

*To the contrary, the Order sets forth numerous
instances, based on its review of the audio recording of
the hearing, in which Respondents' counsel "raised his
voice and sounded agitated." Order, p. 9. The Order
also notes that even after he demanded they recuse
themselves, Respondents' counsel "responded that he did
not doubt the neutrality of the panel." Later, he
threatened to file a complaint with FINRA and continued
to complain about the actions of the panel. Id. at 10.*

*There is no absolutely nothing that has been provided to
FINRA that suggests that this potential arbitrator has
any bias or prejudice against this client or their chosen
counsel. To the contrary, a federal judge has held that
this arbitrator was not biased or prejudiced. The fact
that Respondents' counsel made this potential arbitrator
the bad guy to try to get an arbitration award vacated
against Merrill Lynch cannot mean that he is stricken
from the rolls in every case in which a Respondent
chooses to hire Mr. Weiss. Indeed, I submit that if I
were permitted to strike every arbitrator on the Atlanta
roll simply because I didn't think they liked me or an
old client of mine, the list would be slim pickings.*

*As a final matter, the fact that Respondents' counsel
has been successful in removing this potential
arbitrator from the pool in a previous case is of no
moment. First, I cannot know whether the opposing party
opposed this request. In any event, that case involved
the same FINRA member firm that was the subject of the
motion to vacate. That is not the case here.*

*For all of the foregoing reasons, Claimant respectfully
requests that the Respondents' request be denied.* [6]

On July 13, 2017, counsel for Wells Fargo sent another letter

to FINRA.[7] Therein, counsel for Wells Fargo for the first time

disclosed an agreement between FINRA and counsel for Wells Fargo

---

[6] *Id.*, Ex. F.
[7] Petitioners' Brief, Ex. G.

pertaining to the pool of arbitrators available to his clients in all of his cases:

> It was made clear to me verbally that none of the Postell arbitrators would have the opportunity to serve on any one of my cases given the horrific circumstances surrounding the underlying case, the SEC investigation, the publicity and the aftermath. It was a most unusual set of circumstances.[8]

The Investors sent a follow up letter to FINRA.[9] Therein, the Investors again objected to FINRA providing Wells Fargo's counsel with an edited list of computer-generated arbitrators and requested FINRA disclose whether in fact Wells Fargo and its counsel have their own subset of the FINRA arbitrator list:

> Mr. Weiss' statement that he has an unwritten agreement with FINRA preventing the Postell arbitrators from serving as arbitrators in any case in which he appears as counsel is extremely troubling. Setting aside the fact that a federal judge carefully examined the record in response to his client's motion to vacate found no grounds for vacatur, secret agreements between FINRA and counsel for its member firms culling arbitrators from arbitrator rolls calls into question the fairness of the entire FINRA process.
>
> Mr. Weiss' statement raises several questions that must be answered. Were the other Postell arbitrators striken from the list provided to me in this case? Does Mr. Weiss have secret agreements with FINRA concerning other arbitrators from other cases? It is essential that I receive a response to these inquiries so as to protect my clients' interests.

FINRA never provided any response to these inquiries. Instead, the Director of Dispute Resolution notified the parties

---

[8] *Id.*

[9] *Id.*, Ex. H.

that he had struck the potential arbitrator from the list and supplied the parties with a new, edited, computer generated list:[10]

Dear Parties:

The Director has reviewed all documents in connection with Respondents' request to remove arbitrator Fred Pinckney from the pool of potential arbitrators in this matter.

The request to remove arbitrator Pinckney is hereby granted.

With regards,
Dan

Thereafter, the parties selected three arbitrators from this edited list of arbitrators. The arbitrators chosen by both the Investors and Wells Fargo included Kenneth Canfield, an experienced Atlanta litigator whose law firm explicitly states on its website that it and its lawyers represent plaintiffs in cases against financial institutions. Wells Fargo did not use their strikes to strike Canfield, and he was thus selected by the parties as one of the three arbitrators. On August 25, 2017, Wells Fargo requested FINRA strike Canfield for cause, on the basis that other lawyers in Canfield's firm were representing a plaintiff in a suit against Wells Fargo. The Investors objected to Wells Fargo's request, citing controlling law regarding arbitrator bias:[11]

Ronald Reagan's famous "there you go again" phrase comes to mind in responding to Wells Fargo's latest effort to stack this Arbitration Panel with arbitrators they perceive to be friendly to them and their counsel. Having already gained an extra strike by getting Arbitrator Fred Pinckney ("Arbitrator Pinckney") removed from the list altogether, Respondents chose not to use it on Arbitrator Canfield, a well known and respected Atlanta trial lawyer who has spent his entire career suing banks and other financial institutions on behalf of individuals.

---

[10] Petitioners' Brief, Ex. I.
[11] *Id.*, Ex. K.

The Investors provided FINRA with settled law holding that arbitrator bias does not exist simply because an arbitrator's law firm had either represented or brought a claim against a party to the arbitration:[12]

> No actual conflict exists here. Respondents admit that the facts of the *Hubbard* Lawsuit have no overlap with the facts presented in this case. Indeed, the *Hubbard* Lawsuit arises out of life insurance policies whereas this arbitration pertains to securities. The fact that Arbitrator Canfield's law firm represents a client against Respondent Wells Fargo Advisors, LLC does not in and of itself create an actual conflict. Courts have long rejected attempts to vacate an arbitration award on the ground that an arbitrator's law firm had either represented or brought a claim against a party to the arbitration. *See, e.g., Standard Tankers (Bahamas) Co., Ltd. v. Motor Tank Vessell, AKTI*, 438 F. Supp. 153 (E.D.N.C. 1977) (fact that arbitrator's law firm had represented clients in actions against Exxon and its related companies did not constitute evident partiality).

On September 1, 2017, the Director of FINRA Dispute Resolution ceded to Wells Fargo's demands and struck the arbitrator from the case:[13]

> Please be advised that the request to remove Kenneth Steven Canfield is hereby granted.
>
> Once a replacement arbitrator is appointed, this office will notify you of the replacement Arbitrator and provide you with his/her Arbitrator Disclosure Report, unless all parties agree to proceed with two arbitrators.
>
> If you have any questions, please do not hesitate to contact me at 561-447-4931 or by email at Daniel.Zailskas@FINRA.org.

Thereafter, FINRA provided the parties with a "short list" of potential arbitrators to replace Canfield. This resulted in the appointment of Arbitrator Charles White, a non-lawyer who works in the real estate and construction industries:[14]

---

[12] *Id.*

[13] *Id.*, Ex. L.

[14] Petitioners' Brief, Ex. M.

This letter is to inform you that Kenneth Steven Canfield has been removed from the arbitration panel in the above-referenced case. The replacement arbitrator is Charles White. Attached for your review is Arbitrator White's Disclosure Report.

## Wells Fargo Submits Their Answer

On August 25, 2017, Wells Fargo filed its Answer. FINRA Code of Arbitration Procedure Rule 12303, expressly incorporated into the Arbitration Agreement, required Wells Fargo file a written Answer to the Statement of Claim and assert any counterclaims against the Investors therein. Wells Fargo denied all liability to the Investors. Nowhere in the Answer, however, did Wells Fargo assert any counterclaim against the Investors. Nor did Wells Fargo pay, or FINRA staff direct Wells Fargo to pay, any counterclaim filing fees. The Award does not reflect the filing of any counterclaim or motion to amend the answer to file a counterclaim. Wells Fargo did not request attorneys' fees or costs in the Answer. Its summary paragraph requested only that the claims be denied and that the Investors "be assessed all forum fees."[15]

## The Arbitrators Deny Investors' Request to Delay the Hearing

The arbitration was scheduled to begin on September 24, 2018. On September 10, 2018, the Investors moved to adjourn the arbitration. The Investors notified the Arbitrators that Wells Fargo had just produced 1,882 pages of documents on September 6,

---

[15] *Id.*, Ex. N.

2018, in violation of the FINRA Code of Arbitration Procedure discovery rules:[16]

> It is with great reluctance that Claimants request a short adjournment of the hearing, preferably during November or December 2018, and that the Panel allot seven rather than five hearing days to the hearing. As the Panel is aware, the parties have continued to engage in document exchanges even through today, and counsel for both parties are still digesting literally thousands of pages of key documents such as text messages between Mr. Leggett and his Wells Fargo advisors that were only produced by Wells Fargo last week.

Counsel for the Investors informed the Arbitrators that additional time was necessary to ensure a fair hearing and noted that they had not made any prior requests to continue the hearing:[17]

> Claimants have not previously requested an adjournment and only made the decision to file this motion when it became absolutely clear that additional time is needed to ensure a fair hearing. If the hearing proceeds as scheduled, Claimants will not have been given a fair opportunity to prepare. Counsel should be in final preparation mode working with witnesses, preparing opening statements and the like. Instead, we are still obtaining, reviewing and digesting key relevant documents that should have been produced long ago. For the foregoing reasons, Claimants request the Panel grant the motion to adjourn the hearing.

On September 17, 2018, the Arbitrators denied the Investors' request without providing any explanation or reasoning:[18]

---

[16] Petitioners' Brief, Ex. O.
[17] *Id.*
[18] Petitioners' Brief, Ex. P.

Dear Parties:

The Panel has indicated that the Motion to Adjourn is **DENIED**. I'll post this Order to the Portal as well.

Thanks,
Dan

## The Arbitration Commences

The arbitration hearing commenced in Atlanta on September 24-27, 2018. In the middle of the cross-examination of Wells Fargo's broker, Jacob McKelvey, counsel for Wells Fargo left the hearing with an undisclosed medical emergency. As a result, the Arbitrators delayed the hearing indefinitely. The hearing re-commenced nine months later on June 24, 2019, and concluded on June 28, 2019. The entirety of the hearing was recorded by the Arbitrators on audio tapes pursuant to FINRA Rules. The Investors paid a Georgia certified court reporter to transcribe the June 24-29, 2019, hearing.

## The Arbitrators Make Several Rulings Over the Investors' Objections During the Hearing

On June 27, 2019, counsel for the Investors' requested to call a Schwab representative as a rebuttal witness after the introduction of evidence the day before by Wells Fargo during their examination of Investors' expert witness. Wells Fargo objected. Investors' counsel pointed out that the documents introduced during this testimony were requested and obtained during the adjournment, not before the pre-hearing exchange as required by FINRA rules. The Panel then ruled that the desire to rebut the

"characterization of the information and the trade confirmation" could be accomplished "by Claimant, by counsel, during the argument. The trade confirms are in the record, and we would invite you to address that. We don't feel as if anything would be added by the Schwab representative, and that's our ruling."[19]

On June 28, 2019, during Wells Fargo's examination of their expert witness, Steve Scales, an entirely new set of documents was introduced. Investors' counsel objected to the addition of hundreds of pages to Wells Fargo's expert report. After an explanation by Wells Fargo that it was simply a "compilation of all of the information that is contained in the Bates report," Investors' pointed out that it should have "been represented as such" and that it "would have been nice to have gotten this before the middle of the cross-examination of their expert."[20]

After being given a short recess to review the documents, Investors' counsel continued their objection stating that they had "no way of knowing or the time to figure out whether this is presented in an accurate or fair fashion."[21] The Chairman of the Panel decided to allow the document to come into evidence, but to allow Investors' counsel to call Peter Klouda, expert for Wells Fargo, to examine him about the document.

---

[19] Petitioners' Brief, Ex. A, Transcript, pp. 928-929.
[20] *Id.*, pp. 1194-95.
[21] *Id.*, pp. 1196-97.

Investors' counsel called Peter Klouda the same day. Investors were, however, severely prejudiced by the extreme limitations placed upon them in their questioning and the fact that the witness did not prepare the document. Mr. Weiss stated that Klouda was only "prepared to testify about the solicited versus unsolicited trades."[22] In attempting to clarify where the information from these documents came from, Klouda could not answer the questions to which Wells Fargo said, "[H]e's only got this. Now he's got this. This is what you wanted, this is what you're going to ask from. He's not prepared for anything else."[23] Investors again objected to the evidence being admitted which the Panel chose to ignore.

### Wells Fargo's Witness and Counsel Make Representations Concerning Earlier Testimony

Jacob McKelvey, the Investors' first broker, began his testimony during the initial hearing week in September of 2018, which was captured on audio tape. During his testimony, he was asked questions about text messaging at Wells Fargo:

> Q: Now those text messages never went through compliance at Wells Fargo, did they?
> A: Correct.
> Q: You know that's a no-no?
> A: I do.
> Q: It's a violation of the Written Supervisory Procedures, right?
> A: Right.
> Q: It's a violation of SEC recording keeping rules?

---

[22] *Id.*, pp. 1431.
[23] *Id.*, pp. 1440.

```
A: Right.
Q: You know it's a bad thing, right?
A: Right.
Q: And you did it anyway?
A: Correct.[24]
```

Mckelvey's testimony was interrupted by a medical emergency. Despite the hearing being interrupted in the middle of a witness's testimony, the Arbitrators refused the Investors' request to keep the witness sequestered. When his testimony resumed on June 24, 2019, McKelvey's testimony changed significantly. When the Investors' counsel challenged Mckelvey, Wells Fargo's counsel interjected and provided his recollection as to the earlier testimony:

```
    Q.   (By Mr. Kuglar) Mr. McKelvee, earlier you
11   testified with respect to text messages that you
12   didn't believe that the text messages between you
and
13   Mr. Leggett were violations of FINRA rules,
correct?
14        A.   Correct.
15        Q.   And the last time we were here in
16   September, you did admit that they were
violations of
17   FINRA rules, didn't you?
18        A.   I don't remember that.  I don't recall
19   that.  No.
20        Q.   Do you remember being asked whether
they
21   were a violation of FINRA rules?
22        A.   I don't.
23        Q.   In September, I asked you if these
text
24   messages were a violation of FINRA rules, and you
25   said yes, that you agreed they were.
    A.   I don't remember that.
```

---

[24] Petitioners' Brief, Hearing Recording, 9/26/2018, 1024, 50:27.

2        Q.    Did you do any homework or study during

3   this adjournment with respect to policy and

4   procedures pertaining to text messages?

5        A.    No.

6        Q.    Sorry?

7        A.    No.

8        Q.    Did you read anything?

9        A.    No.

10       Q.    Did you ask anybody for clarification?

11       A.    No.

12       Q.    And now, this time around, you believe and

13  you have an understanding that text messages with

14  your securities customers can be -- are not a

15  violation and with -- where you're not talking about

16  specific transactions. That's what you testified

17  earlier, right?

18       A.    I don't believe that's a violation.

19       Q.    So unless the client is saying, buy gold

20  today, that's what you mean by a specific

21  transaction, right?

22           MR. WEISS:  That wasn't his

23       testimony.

24           THE WITNESS:  Well, first of all, I

25       would never take an over via text.

MR. WEISS:  Well, his testimony

2       before was if you're not doing business.

3           THE WITNESS:  Right.  Yeah.  That's

4       exactly what I said.  If you're not

5       conducting business, i.e., taking an order.

6       Q.    (By Mr. Kuglar)  Okay.  Where did you hear

7  that term, not conducting business?  Because you

8  certainly didn't use that last time.

9       A.    I don't remember what I used last time.

10          MR. WEISS:  Do you have a transcript

11      or something?  Wait a minute.  You're

12      saying what he said last time.  I don't

13      recall that either.  It's a difference of a

14      fact.

15         MR. KUGLAR:  We do, actually. I

16      have our notes, and I recall it.

17         MR. WEISS:  Okay.  I don't recall

18          it.[25]

The changes to Mr. McKelvey's testimony did not end there.
During the first hearing, he stated the following regarding his
understanding of how solicited versus unsolicited trades are
entered at Wells Fargo:

> Q: When you go in to this system the default, the default
> is solicited, isn't it?
> A: Uh, I don't believe that's correct.  I think there's
> a drop-down box.
> Q: Ah.  So, you click on the box
> A: Correct.
> Q: And then S or, or I'm sorry Y or no.
> A: Well.
> Q: And you specifically have to hover your mouse over Y
> or no, right?  'Cause it says solicited and drops down.
> A: It's a box.  I'm not sure if the box says unsolicited
> or solicited or Y or no, yes or no.[26]

And again, upon continuation of McKelvey's examination, his
testimony changed significantly.

> Q.     Okay.  So you don't recall seeing that
> 5    trade blotter where it was marked solicited for
> that
> 6    big Allergan trade?
> 7         A.     The -- I recall you showing me a
> document
> 8    that said that.  Yes, sure.
> 9         Q.     And your position was that that was a
> 10   mistake and, like everything else, that was in
> truth
> 11   unsolicited?
> 12        A.     Yes, because the default for our
> system is
> 13   solicited unless you change it to unsolicited.
> So

---

[25] Petitioners' Brief, Ex. A, Transcript, pp. 208-210.
[26] Petitioners' Brief, Hearing Recording, 9/26/2018, 1024, 49:16.

14   yes.[27]

The changed testimony, as well as the representations to the Panel by Wells Fargo's counsel as to what the testimony had been, were not apparent at the time as the audio tapes were not immediately available to the Investors for replay.

Wells Fargo's counsel misrepresented other evidence to the Panel during the hearing, inserting himself as an unsworn fact witness. During questioning of McKelvey on June 27, 2019, Wells Fargo's counsel testified that the Bates report is "based on settlement dates, not trade date, so it wouldn't be the same as the date of the other thing."[28] And again during the same witness he represented to the Arbitrators, "[J]ust to make sure everybody clear, that's three days late, because it's settlement date."[29] And when Arbitrator Schweber asked to clarify, Weiss did so: "[R]ight. Three days' difference on the stock."[30] But when Investors' counsel brought this up later with Wells Fargo's expert witness, Steve Scales, Weiss backpedaled quickly. He said then, "[I]f you've got a questions about a specific situation you're going to have the guy who did it in whatever, and you just ask him if you want."[31]

---

[27] *Id.*, Ex. A, Transcript, p. 26.
[28] Petitioners' Brief, Ex. A, Transcript, p. 1099.
[29] *Id.*, p. 1105.
[30] *Id.*, pp. 1105-06.
[31] Petitioners' Brief, Ex. A, Transcript, pp. 1392-93.

**Wells Fargo Refuses to Produce Key Documents to the Investors Until After the Close of Evidence**

On June 25, 2019, during the second day of the second week of the hearing, Investors' counsel asked for Wells Fargo's internal rule regarding texting after Pickett testified as to what the rule says. Wells Fargo's counsel objected to this request on the grounds that it was not specifically asked for during the discovery process. The chair ordered that Wells Fargo produce the document.[32] Two days later, this document had still not been produced as ordered. Investors' counsel was forced to bring this issue up again in the hearing saying that Investors have "been told for two days that we can't get the rule, so I would appreciate the rule."[33] Wells Fargo's counsel responds that they are "getting it Bates-stamped."[34]

The next day, which was also the last day of the hearing, Investors' counsel asks yet again for the rule to be produced to be able to use it as part of their closing statement. The rule was still not produced. Closing arguments were then made. Only then, and again upon demand from Investors' counsel, Wells Fargo finally produced the two pages, after it could have been used for examination of witness or in the closing argument.[35]

---

[32] *Id.*, p. 372.
[33] *Id.*, p. 821.
[34] *Id.*
[35] Petitioners' Brief, Ex. A, Transcript, p. 1531.

### The Panel Denies Wells Fargo's Motion to Amend Its Answer to Seek Attorneys' Fees and Costs

At the conclusion of the evidentiary hearing, Wells Fargo moved to amend its Answer so as to make a claim for attorneys' fees and costs. The Award reflects that "during the evidentiary hearing, Respondents made an ore tenus motion to amend their Statement of Answer to include a counterclaim for the sole purpose of requesting attorneys' fees and costs.[36] The Panel denied the motion as untimely."[37]

### Wells Fargo Seeks to Introduce Evidence Supporting a Request for Fees and Costs

FINRA Code of Arbitration Procedure Rule 12514, expressly incorporated into the Arbitration Agreement, required Wells Fargo to exchange all documents they intended to use and identify all witnesses they intended to call at the hearing and precluded the use of any documents or witnesses not identified. The Investors listed their counsel, Craig H. Kuglar, Esq., as a witness with respect to their request for attorneys' fees and costs and identified records relating to fees and expenses as documents they intended to present at the hearing. Wells Fargo, on the other hand, did not list any witness with respect to any counterclaim or claim for fees and expenses, and did not provide the Investors

---

[36] *Id.*, Ex. C.
[37] *Id.*

with any proof of their costs or expenses at any time including during the hearing.

During the examination of Ken McAfee, Wells Fargo's regional brokerage manager in Atlanta, Wells Fargo's counsel began a line of questioning about legal fees and costs that resulted from this arbitration. The Investors' counsel objected on the grounds that Wells Fargo had no counterclaim pending nor had they submitted fees or expenses.[38] The arbitrators immediately said they would allow the questioning.[39] Investors' counsel objected again because they had no way to cross-examine the witness about this.[40] The arbitrators not only allowed the witness to answer questions about whether they had paid legal fees and expenses, but they allowed Wells Fargo's counsel to read off numbers from a document that no one had seen nor had, and which Wells Fargo's counsel said, "[W]e are not submitting this into evidence. . . She can read whatever she wants and ask him a question."[41] The questions asked were as follows:

```
     Q.    Are the fees in excess of $433,770?
14         A.    Yes.
15         Q.    Are the costs in excess of $15,000
and
16    $34,296?
17         A.    Yes.
18         Q.    Have your FINRA costs been more than
```

---

[38] Petitioners' Brief, Ex. A, Transcript, p. 846.
[39] *Id.*
[40] *Id.*, pp. 846-47.
[41] *Id.*, p. 848.

19    $2000?[42]

This was the entirety of the testimony and evidence of costs presented by Wells Fargo. Despite the absence of any evidence regarding expert witness fees, when the Award was issued, the Arbitrators stated that Wells Fargo's counsel "questioned one of Respondents' witnesses regarding some of the costs incurred in this matter, including expert witness fees. The witness provided specific numbers in this regard. The Panel deemed this line of questioning to be Respondents' request for costs, which the Panel notes does not require an amendment to the pleadings in order to be considered."[43]

**The Arbitration Award**

The Arbitrators served their Award on August 1, 2019.[44] The Arbitrators denied all of the Investors' claims in their entirety. The Arbitrators awarded Wells Fargo $51,000.00 against Leggett, "representing costs incurred by Respondents in connection with this matter." The Arbitrators likewise assessed $400.00 in discovery-related motion fees and $32,200.00 in hearing session fees against Leggett. The Investors filed a motion to correct the arbitration award, noting that the Arbitrators miscalculated the hearing session fees they purported to impose against Investor

---

[42] Petitioners' Brief, Ex. A, Transcript, p. 848.
[43] *Id.*, Ex. C.
[44] *Id.*

Leggett under the calculations mandated by the FINRA Code of Arbitration Procedure. The Arbitrator denied the motion which requested the session fees be reduced from $32,200.00 to $17,250.00 consistent with a table of session fees set forth under the FINRA Code of Arbitration Procedure. In denying this request, the Arbitrator provided no explanation:[45]

> Re: *Claimant's Motion to Correct Arbitration Award.* Dated August 9, 2019
>
> Denied!
>
> Robert Lestina, Chair
> August 23, 2019

### The Parties File Timely Motions to Vacate and Confirm the Award

The Investors filed a timely petition to vacate. Wells Fargo filed a timely opposition and cross motion to confirm. The record presented to this Court included relevant portions of the hearing recording tapes and transcript of the arbitration proceeding. The Court held oral argument on November 9, 2021, affording both sides a full opportunity to present their evidence and arguments.

### Discussion

### I. Legal Standard

The Federal Arbitration Act ("FAA") provides that a party to an arbitration may apply to a district court for an order

---

[45] Petitioners' Brief, Ex. U.

confirming an arbitration award.[46]  The court must then confirm the award "unless the award is vacated, modified, or corrected as prescribed in" the statute.[47]  Section 10(a) provides the four statutory grounds for vacatur:

> (1) where the award was procured by corruption, fraud, or undue means;

> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.[48]

"The party challenging the arbitration award bears the burden of asserting sufficient grounds to vacate the award."[49]

---

[46] 9 U.S.C. § 9.  "The FAA applies in state and federal courts to all contracts containing an arbitration clause that involves or affects interstate commerce."  *Am. Gen. Fin. Servs. v. Jape*, 291 Ga. 637, 638 (2012) (citing *Perry v. Thomas*, 482 U.S. 483, 489 (1987)).

[47] *Id.*

[48] 9 U.S.C. § 10(a).

[49] *Aldred v. Avis Rent-ACar*, 247 F. App'x 167, 169 (11th Cir. 2007); *see also Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1289 (11th Cir. 2002) ("The burden is on the party requesting vacatur of the award to prove one of [the] four [statutory] bases [under the FAA].").

## II.  Analysis

The Investors challenge five aspects of the Arbitrator's award.  First, they argue that Wells Fargo's refusal to utilize the FINRA neutral computer-generated arbitrator list and striking an arbitrator initially selected by Wells Fargo violated 9 U.S.C. § 10(a)(4).  Second, they argue that the Arbitrators violated 9 U.S.C. § 10(a)(3) in denying the Investors' request to postpone the hearing.  Third, they argue that the Arbitrators violated 9 U.S.C. § 10(a)(3) by refusing to hear relevant, non-cumulative testimony from a third-party witness and unfairly limiting the cross examination of a Wells Fargo expert witness.  Fourth, they argue that the award was procured by fraud in violation of 9 U.S.C. § 10(a)(1).  Finally, they argue that the arbitrators violated 9 U.S.C. § 10(a)(3) with respect to the award of costs and session fees.  The Court addresses each of these issues below.

### The Arbitrator Selection Process Violated 9 U.S.C. § 10(a)(4)

The Investors argue that arbitrator selection and the striking of an arbitrator initially selected by Wells Fargo violated 9 U.S.C. § 10(a)(4).

The FAA permits vacatur if the court finds "[an] overstepping by the arbitrators of their authority."  In vacating an arbitration award in a recent case, the Supreme Court explained that "an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator exceeded his powers" "when an

arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice."[50] "It is well-established that courts may set aside awards when the arbitrator exceeds his contractual mandate by acting contrary to express contractual provisions."[51]

The Court's factual review of the record evidence leads to its finding that Wells Fargo and its counsel manipulated the FINRA arbitrator selection process in violation of the FINRA Code of Arbitration Procedure, denying the Investors' their contractual right to a neutral, computer-generated list of potential arbitrators. Wells Fargo and its counsel, Terry Weiss, admit that FINRA provides any client Terry Weiss represents with a subset of arbitrators in which certain arbitrators (at least three, but perhaps more) are removed from the list Wells Fargo agreed, by contract, to provide to the Investors in the event of a dispute. Permitting one lawyer to secretly red line the neutral list makes the list anything but neutral, and calls into question the entire fairness of the arbitral forum.

Wells Fargo argues that it had a right to file a motion to remove arbitrators pursuant to FINRA Rule 12407(a). That Rule,

---

[50] *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671-72 (2010).
[51] *PoolRe Ins. Co. v. Organizational Strategies, Inc.*, 783 F.3d 256, 262 (1st Cir. 2015) (citing *Beiard Indus. Inc. v. Local 2297, Int'l Union*, 404 F.3d 942, 946 (5th Cir. 2005)).

however, pertains to arbitrators selected from the computer-generated neutral list. And, the Rule itself confirms that "[t]he Director must first notify the parties before removing an arbitrator on the Director's own initiative." The record here shows that Wells Fargo and its counsel, Terry Weiss, insisted on three potential arbitrators be removed from the neutral list itself, prior to arbitrator selection, without notification to any parties, in every case in which Terry Weiss appeared for any client. The only reason this secret agreement came to light was because FINRA accidentally included one of the three Postell arbitrators, Fred Pinckney, on the neutral computer-generated list.

Within this factual context, the Court finds that the later removal of Arbitrator Canfield also violated 9 U.S.C. § 10(a)(4). The record shows that Wells Fargo was fully aware of Mr. Canfield's potential conflict of interest prior to their selecting him to serve as an arbitrator. Wells Fargo argues that the lawsuit filed against Wells Fargo by other attorneys in Mr. Canfield's firm was only filed after arbitrator selection. However, FINRA's rule only permitted striking the arbitrator where the interest or bias was "definite and capable of reasonable demonstration," and further provides that "close questions regarding challenges to an arbitrator by a customer under this rule will be resolved in favor of the customer." Here, the record shows that the arbitrator fully

disclosed his firm's activities prior to arbitrator selection. The newly filed case did not create any newly disclosed interest or bias against Wells Fargo.

### The Arbitrators' Refusal to Postpone the Hearing Violated 9 U.S.C. § 10(a)(3)

The Investors argue that the Arbitrators violated 9 U.S.C. § 10(a)(3) in denying the investors' request to postpone the hearing. The facts set forth, *supra*, demonstrate that the Arbitrators violated 9 U.S.C. § 10(a)(3) when they denied the Investors' request to postpone the hearing after Wells Fargo dumped thousands of pages of relevant documents, well beyond the timeframe required by the FINRA Code of Arbitration Procedure and scheduling orders entered by the Arbitrators.

An arbitration award may be vacated where the arbitrators were "guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown."[52]  Court's provide arbitrators with a degree of discretion in exercising their judgment assuming there exists a reasonable basis for the arbitrators' decision.[53]

---

[52] 9 U.S.C. § 10(a)(3).

[53] *Fairchild & Co. v. Richmond, F. & P. R. Co.*, 516 F. Supp. 1305, 1313–14 (D.D.C. 1981).  *See, e.g., Coastal Gen. Const. Servs., Inc. v. Virgin Islands Hous. Auth.*, 238 F. Supp. 2d 707, 710 (D.V.I. 2002), *aff'd sub nom. Coastal Gen. Const. Servs. Corp. v. Virgin Islands Hous. Auth.*, 98 F. App'x 156 (3d Cir. 2004) ("the arbitrator's refusal to give VIHA time to investigate the amended claim presented by Coastal less than twenty-fours before the hearing amounts to misconduct as it clearly affected VIHA's right to a fair hearing.").

The Arbitrators provided no basis for their decision to deny the Investors' request for a short delay – a delay necessitated not by the Investors' failure to prepare but rather due to Wells Fargo's late production of documents outside the time periods set forth by the FINRA Code of Arbitration Procedure. Wells Fargo argues there was no harm because the hearing was ultimately delayed mid-testimony due to Wells Fargo counsel's medical emergency. The fact that the hearing was suspended due to a medical emergency after opening statements and multiple witnesses had already testified did not erase the harm the Investors and their counsel had already sustained.

### The Arbitrators' Refusal to Hear Relevant, Non-Cumulative Evidence Violated 9 U.S.C. § 10(a)(3)

The Investors argue that the Arbitrators violated 9 U.S.C. § 10(a)(3) by refusing to hear relevant, non-cumulative testimony from a third-party witness and unfairly limiting the cross examination of a Wells Fargo expert witness. The record evidence reviewed by the Court confirms that the Arbitrators violated 9 U.S.C. § 10(a)(3) by refusing to hear relevant, non-cumulative testimony from two separate witnesses.

The FAA permits vacation "where the arbitrators were guilty of misconduct…in refusing to hear evidence pertinent and material to the controversy…"[54] A court "may vacate an arbitrator's award

---

[54] *Id.*

under 9 U.S.C. § 10(a)(3) only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties and denies them a fair hearing. Further, an arbitration award must not be set aside for the arbitrator's refusal to hear evidence that is cumulative or irrelevant."[55] The facts of the *Robbins* case are illustrative. There, the Eleventh Circuit held that the arbitrator did not engage in misconduct in refusing to hear testimony where the party requesting the testimony had previously represented that the testimony "was 'unimportant' to their case and that if given would only provide cumulative evidence."[56]

The record evidence supports a finding that the Arbitrators refused to hear testimony from two separate witnesses, each of whom had relevant, non-cumulative evidence relating to the two main claims asserted by the Investors.

Wells Fargo introduced evidence and elicited testimony relating to the Investors' investments and investment making decisions after they moved their accounts from Wells Fargo to Schwab. The Investors initially objected to any testimony or witnesses being introduced on these grounds. In response to this evidence being introduced, the Investors requested the Arbitrators hear evidence from the Investors' new stockbroker at Schwab, noting

---

[55] *Robbins v. Day*, 954 F.2d 679, 685 (11th Cir. 1992).
[56] *Id.*

that he was prepared to testify by phone without necessity of a subpoena.

The Arbitrators refused to allow this witness to testify. Earlier in the hearing, one of the Arbitrators disclosed that he had a close personal relationship with this third-party witness. The Arbitrators' decision to deny the Investors' their right to present this relevant testimony was undoubtedly influenced by the possibility that the appearance of the witness would require one of the three Arbitrators to recuse himself. And, the Arbitrators permitted Wells Fargo to present an expert witness by telephone at the last minute who was never identified as a potential witness. Having so ruled, the Arbitrators then severely restricted the Investors' cross-examination of the expert, refusing to permit counsel for the Investors to fully cross-examine this surprise witness in violation of their statutory right to present evidence.

### The Award Was Procured by Fraud in Violation of 9 U.S.C. § 10(a)(1)

The Investors argue that the Arbitration Award was procured by fraud in violation of 9 U.S.C. § 10(a)(1). The Court's review of the factual evidence presented by the Investors leads to its factual finding that Wells Fargo and its counsel committed fraud on the arbitration panel by procuring perjured testimony, intentionally misrepresenting the record, and refusing to turn

over a key document to the Investors until after the close of evidence.

The FAA permits an award to be vacated "where the award was procured by corruption, fraud or undue influence."[57] In *Bonar v. Dean Witter Reynolds, Inc.,* [58] the Eleventh Circuit found that perjury constitutes fraud within the meaning of section 10(a) of the Federal Arbitration Act and established a three-part test to determine whether an arbitration award should be vacated for fraud. First, the moving party must establish fraud by clear and convincing evidence. Second, the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration. Third, the fraud must have materially related to the arbitration.[59]

The transcripts satisfy the Investors' burden of proving the fraud on the panel by clear and convincing evidence. The audio tapes, which were not available to the Investors until after the close of the hearing, confirm that Wells Fargo's key witness used the delay caused by the medical emergency to materially change his testimony and offer perjured testimony in direct contravention of the earlier testimony. In addition, counsel for Wells Fargo inserted himself as a fact witness and purported to testify to the

_____

[57] 9 U.S.C. § 10(a)(1).
[58] 835 F.2d 1378, 1383 (11th Cir.1988).
[59] *See also O'Rear v. Am. Family Life Assur. Co. of Columbus*, 817 F. Supp. 113, 115 (M.D. Fla. 1993).

Panel himself to support the changed story. The relevance of this testimony cannot be understated. The Arbitrators specifically held that "the Panel finds that neither Respondent Pickett nor Non-Party McKelvey engaged in any wrongful conduct." The Arbitrators were clearly misled by McKelvey's second round of testimony (after the medical break) and the affirmation of Wells Fargo's counsel, who falsely mischaracterized his prior testimony. The presentation of perjured testimony along with counsel's mischaracterization of the previous testimony, which he knew was not yet transcribed, resulted in a fraud on the Arbitrators that had an obvious impact on their final Award.

The same is true for the key document intentionally withheld from the Investors until after the close of the evidence. During the hearing, a number of Wells Fargo witnesses testified about and characterized in their own words a key internal Wells Fargo Rule pertaining to brokers text messaging their customers. For instance, their broker's testimony after the medical break changed, and his new story was that texting with the Investors was permitted so long as "you're not conducting business." Wells Fargo stonewalled producing this document to the Investors until after the conclusion of the hearing. That document in fact states that "the Firm prohibits Associates from sending or responding to business communications by text message." The refusal to hand

over this document, like the perjured testimony, amounted to a fraud on the Panel.

**The Arbitrators Violated 9 U.S.C. § 10(a)(3) By Imposing Costs and Hearing Session Fees Against the Investors**

The Investors argue that the Arbitrators violated 9 U.S.C. § 10(a)(3) by (i) awarding Wells Fargo $51,000.00 in costs in violation of the arbitral forum's Code of Arbitration Procedure; and (ii) purporting to impose hearing session fees against the Investors that exceeded the hearing session fees permitted under the FINRA Code of Arbitration Procedure.

The Court agrees that the Arbitrators ignored the contractual framework the parties had agreed to and imposed liability beyond that which was permitted or contemplated, thus dispensing their own brand of industrial justice in violation of the FAA.

FINRA's Code of Arbitration Procedure, incorporated by the parties' Arbitration Agreement, does not contain any provision granting arbitrators the authority to shift the expenses of litigation. To the contrary, FINRA Code of Arbitration Procedure Rule 12902(c) provides "In its award, the panel must also determine the amount of any costs and expenses incurred by the parties under the Code or that are within the scope of the agreement of the parties, and which party or parties will pay those costs and expenses." The recent decision in *Ameriprise Fin'l Serv's, Inc.*

*v. Brady*[60] is instructive. There, the court held that FINRA arbitrators exceeded their authority, in violation of 9 U.S.C. § 10(a)(3), by awarding attorneys' fees against a losing party. The agreement there, as in this case, did not provide for a fee shift in the event the prevailing party lost.[61]

The Arbitration Agreement provided for the application of New York law. "It is well settled in New York that a prevailing party may not recover attorneys' fees from the losing party except where authorized by statute, agreement or court rule."[62] In this case, Wells Fargo did not provide the Arbitrators with any statute, agreement, or court rule supporting their claim for attorneys' fees. The Arbitrators' Award does not provide any such support. Rather, it simply states "Claimant Leggett is liable for and shall pay to Respondents the sum of $51,000.00, representing costs incurred by Respondents in connection with this matter."[63]

Even if the Arbitrators had the authority to assess fees and/or costs against Leggett, here there was no valid evidence to support this number. During the examination of Ken McAfee, Wells Fargo's regional brokerage manager in Atlanta, Wells Fargo's counsel began a line of questioning about legal fees and costs

---

[60] 2018 WL 4344993, No. 18-10337 (D. Mass. Sept. 11, 2018).
[61] *Id.* at *8.
[62] *U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 3 N.Y.3d 592, 597, 822 N.E.2d 777, 779-80 (2004).
[63] Petitioners' Brief, Ex. C.

that resulted from this arbitration to which Investors' counsel objected on the grounds that Wells Fargo had no counterclaim pending nor had they submitted fees or expenses.[64] The Arbitrators immediately said they would allow the questioning. The Investors' counsel objected again because they had no way to cross-examine the witness about this. The Arbitrators not only allowed the witness to answer questions about whether they had paid legal fees and expenses, but to read off numbers from a document that no one had seen nor had, and which Wells Fargo's counsel said, "[W]e are not submitting this into evidence. . . She can read whatever she wants and ask him a question."[65] The questions asked were as follows:

> Q. Are the fees in excess of $433,770?
> 14 A. Yes.
> 15 Q. Are the costs in excess of $15,000
> and
> 16 $34,296?
> 17 A. Yes.
> 18 Q. Have your FINRA costs been more than
> 19 $2000?[66]

This was the entirety of the testimony and evidence of fees or costs introduced by Wells Fargo, with no mention of expert witness fees. When the Award was issued, however, the Arbitrators stated that Wells Fargo's counsel "questioned one of Respondents' witnesses regarding some of the costs incurred in this matter,

---

[64] *Id.*, Ex. A, Transcript, pp. 846.
[65] *Id.*, p. 848.
[66] *Id.*

including expert witness fees. The witness provided specific numbers in this regard. The Panel deemed this line of questioning to be Respondents' request for costs, which the Panel notes does not require an amendment to the pleadings in order to be considered."[67] Not only were these not specific numbers, these numbers were never proven or entered into evidence.

The Arbitrators also improperly imposed "session fees" (the fees paid to the Arbitrators) against the Investors that were inconsistent with the FINRA Code of Arbitration Procedure. The Investors filed a motion to correct the Arbitration Award, noting that the Arbitrators miscalculated the hearing session fees they purported to impose against Leggett under the calculations mandated by the FINRA Code of Arbitration Procedure. The Chair Arbitrator denied the motion, which requested the session fees be reduced from $32,200.00 to $17,250.00 consistent with a table of session fees set forth under the FINRA Code of Arbitration Procedure. In denying this request, the Arbitrator provided no explanation:[68]

> Re: *Claimant's Motion to Correct Arbitration Award.* Dated August 9, 2019
>
> Denied!
>
> Robert Lestina, Chair
> August 23, 2019

---

[67] Petitioners' Brief, Ex. C.
[68] *Id.*, Ex. U.

Judicial review of arbitration awards, while limited in nature, ensure that the arbitration process is fundamentally fair to all parties involved. In this case (1) Wells Fargo and its counsel manipulated the arbitrator selection process; (2) the Arbitrators refused to postpone the hearing and provided no basis for their decision despite the Investors providing ample cause for postponement; (3) the Arbitrators denied the Investors their statutory right to present testimony from two relevant, non-cumulative witnesses; (4) Wells Fargo witnesses and its counsel introduced perjured testimony, intentionally misrepresented the record, and refused to turn over a key document until after the close of evidence; and (5) the Arbitrators improperly and without legal justification imposed costs and fees on the Investors in violation of the contractual framework that bound the parties. The Court finds that each of these violations provides separate, independent grounds to vacate the Award in its entirety. Accordingly, the Panel's award is **VACATED**.

## Conclusion

As discussed above, Petitioner's Motion to Vacate is **GRANTED**, Respondents' Motion to Confirm is **DENIED**.

**SO ORDERED**, this 25ᵗʰ day of January, 2022.

HON. BELINDA E. EDWARDS
Judge, Fulton Superior Court