approached me five or six years after the

2  movement begun in our state and told me that

3  they really improved their district education,

4  and they learned a lot of things from the

5  different models that are being presented.

6  Q.  Explain as part of your background how your

7  philosophy with charter schools and your

8  involvement with charter schools led to American

9  Charter Development?

10  A.  Well, in my experience, initially,

11  recognized that charter schools typically don't

12  have the same advantages as a district school to

13  be able to form a bound and be able to build a

14  facility.  In fact, most states don't have any

15  construction development money available for

16  charter schools, and my feeling was that if we

17  could proliferate this movement across the

18  county, it will allow us to try a different way,

19  and we have been involved with charter schools

20  across the country, some of that focus on

21  athletics and some on the music and some on STEM

22  and STEAM and DREAM and just all kinds of models

23  that are beneficial.  And Z think we all learn

from those types of learning methodology, and it

2   helps to give choice in education, and

3   certainly, some of those are not going to

4   resonate with some kids, but there are enough

S   that benefit from it that I am -- I am not just

a believer that parents are able to recognize

7   what's going to work best for their children,

8   and so I am philosophically in favor of that

9   choice.

10   Q.   And how does American Charter Development,

11   what services do they provide to starting up

12   startup charter schools?

13   A.   American Charter Development has a unique

14   role in charter schools in that we come in, we

15   work with the school, we look at their program,

16   we work with them in terms of what their

17   facility needs are.  We help them manage some of

18   their financial burdens, help them with their

19   career, and what they might need in terms of

20   facilities and working capital.  We take

21   basically that school -- and typically, the

22   schools are very experienced.  They're just

23   motivated parents who want change and want the

opportunity and have drive for passion.  So we

2  usually underwrite the board.

3       Obviously, it's a very high risk

4  investment, because we're dealing with very

5  unseasoned new startup schools that are

nonprofits that don't have any ability to

7  guarantee.  And we have to look at the

8  demographics of the area that are sometimes

9  difficult.  In fact, we are probably the only

10  national provider that will even go into rural

11  small communities and underwrite schools.  We

12  are passionate, and it's probably not a wise

13  business decision, but we are passionate that

14  every kid is important, and that everyone should

15  have that opportunity.

16       A lot of the small rural areas are the ones

17  that have the least opportunity to have the

18  choice in their educational opportunities.

19       So we have taken and have particularly in

20  this case taken on a very rural, a very small

21  school that, you know, if not allowed to

22  proceed, will definitely have a greater impact

23  for us and for the community, because the

building is really designed as a school and

2  could be a huge significant thing in the

3  community.

4  Q.    We are going to get to that in a second.

S  A.    We are committed to the charter schools.

Q.    Briefly, give us some of the states in

7  which American Charter Development is involved.

8  A.    We work literally coast to coast.  We

9  worked in the Carolinas, have a strong presence

10  there.  We worked in Georgia, Florida, now

11  Alabama.  We worked in Texas and Tennessee and

12  Colorado and Utah, Arizona, Nevada, Idaho.  We

13  have been in multiple states.

14  Q.    And, in fact, have some of your employees

15  or team members assisted commission -- I think,

16  assisted this commission early on in

17  A.    Yes.

18  Q.    -- in how to organize a charter school and

19  goals and that sort of stuff?

20  A.    Yes.  Tustin from our New York office has

21  done some training.  He does a lot of work to

22  try to help author writers get best practices

23  and try to help particularly states that are

Page 299

just starting out.  We were interested in

2    Alabama.  They were kind of one of the latter

3    ones to come on to, but model their statute.

4    And there's some very good statutes and have a

5    good startup.

So it's a pleasure to see that kind of

7    thing happening; although, first end are

8    often battered and bruised the most.

9    Q.   Speaking of being battered and bruised, is

10   it accurate that ACID did not get financially

11   involved with Woodland Prep until the commission

12   had granted it a charter?

13   A.   That's always the case.  Really, the only

14   thing we have to rely on is the charter contract

15   with the state and the fact that the school is

16   chartered through the state or through whatever

17   author writers the state permits.  But without

18   that charter in place, we really don't have

19   anything else to rely on, and so we don't

20   respond or get -- we may become predominately

21   involved with the school to help them and give

22   suggestions and things, but don't come

23   financially involved until they have acquired

their charter.

2      Q.   And once Woodland Prep acquired its

3    charter, ACD became financially involved with

4    the development of Woodland Prep; is that

S    correct?

       A.   Yes.  We made a significant financial

7    commitment to Woodland Prep to help them to

8    advance that charter forward.

9      Q.   Briefly explain what all that entails or

10   some of what that entails.

11     A.   Sure.  Again, we work with the school to

12   see what their needs are, what kind of

13   curriculum they're hoping to implement, what

14   that would require.  On a facility's standpoint,

15   we have to locate property, to look at zoning.

16   We have to look at the tracks that are

17   historical and that are sort of being looked at

18   placing utilities, and we look at environmental

19   concerns and online.  There's a lithium of tests

20   and other things that we need to do in order to

21   get ready to break ground.  I think Mike

22   previously mentioned a number of those, but we

23   have --

Page 301

Q.    Did you select --

2    A.    We go through --

3    Q.    You selected an Alabama contractor to build

4    the school in Alabama?

5    A.    Yes, we did.  We felt like it would be wise

6    to have an Alabama contractor that is familiar

7    with the state statutes and the local codes.

8    Although, we do build across the country, we

9    know that every state is unique.

10    Q.    I want to ask you about a January 15th and

11    January 31st date that has been asserted by the

12    commission's lawyer as a cutoff date for a

13    certificate of occupancy.

14        What's your understanding of how that date

15    came about and what its significance was?

16    A.    My understanding -- and I was not at the

17    hearing, but I was told that they were asked

18    what is the best or the earliest that the

19    property could be completed for the school, and

20    that it was derived from the mention by the

21    contractor that if everything went well, they

22    thought it could get done in that time frame.

23        My concern when I heard about that was that

it would not be in the school's best interest to

2   finish the school in January.  It would bring

3   significant reliability to have a completely

4   a completed building sitting empty ripe for

S   people to vandalize the building, and maintain

it, heat and cool it, and secure it, and just to

7   have that money completely spent and be

8   servicing that debt for the eight months or so

9   that it's not in use just did not seem wise.

10      And so actually, I made a trip to Alabama

11  and attempted to meet with many of the

12  commissioners.   got a chance to meet with a

13  few, but I was unable to meet with all of them,

14  to explain to them, and I believe this was back

15  in November or so of last year, 2019, and the

16  purpose for that -- I just heard that we or the

17  school had made a commitment to have that in

18  that timeframe, and I wanted to explain to the

19  commissioners the timing of having it on that

20  schedule, that it would not be in the school's

21  best interested financially or any other way to

22  have that building sitting vacant during that

23  time frame, not to mention the problems with the

weather and other things that Mike has already

2   explained.

3   Q.   Did ACD intentionally try to delay the

4   construction of the school?

5   A.   Absolutely not.  We have done the exact

opposite.

7   Q.   Does the opening of the school have

8   anything to do with whether the certificate of

9   occupancy is January, February, March, April,

10  May, June, or July, if it's not going to open

11  until August?

12  A.   No, it doesn't.  In fact, we have

13  throughout our career had a number of situations

14  where we have not even been able to begin

15  construction until late spring and have had to

16  work double shifts and things to be able to get

17  projects done, and it opened actually in August

18  in order to get the school.  And some of those

19  have just been a function of how the local

20  politics work.  But it is interesting that

21  several of the schools and other charter schools

22  have not been completed until just before the

23  school was to begin, and it seems a little

discriminatory to hold it to a standard.

2   Q.   Are you going to do everything possible to

3   make sure this school building is open?

4   A.   Absolutely.  You know, Chuck, we have a

5   kind of real interest in making sure charter

6   schools succeed.  While most of them open and

7   are full and do very, very well, there are

8   several that have opened with lower enrollment

9   or for one reason or another and struggled due

10  to some kind of issue with the board, due to

ii  maybe some issues in the community, which these

12  schools seem to have, and we have a -- we're a

    true public private partnership, where we don't

14  succeed unless the school succeeds and the

15  children succeed.

16       So if the children aren't having a good

17  experience, they're not getting involved.  If

18  the school is not doing its job, they're not

19  going to be successful.  And if either of those

20  two are not successful, then we're not

21  successful.  So we're kind of hanging with the

22  school, and we provide -- we are truly their

23  partner in the financing and providing of the

facilities per school. I mean, we will do

2 everything in our power to see that the school

3 is successful. There are certain schools that

4 we have seen open with low enrollment, and we've

5 ended up going years with either no or very

6 limited lease payments in order to get them up

7 and running. But if we have time, we will

8 always be able to turn the school around and get

9 them to be a very valuable asset to the

10 community.

ii Q. Has any school that ACD has supported

12 financially, have any of them closed due to

financial problems?

14 A. No. We have supported the schools to our

15 detriment and have lost even millions in some

16 instances to keep schools open and to eventually

17 turn them around. Certainly, not our economic

18 plan. We do what we have to to make sure that

19 the schools are successful.

20 Q. How much money has ACD spent on this

21 project approximately?

22 A. Approximately $3 million. But we have

23 committed and have already made financial

commitments for nearly $7 million on the

2  project, and it certainly doesn't make any sense

3  to have two half-built buildings out there in an

4  open lot in Washington County.  So we need to

5  finish the school.

Q.   Why are you still building the school in

7  light of the commission giving this notice it

8  was going to have this revocation hearing?

9  A.   Well, basically, we are committed to the

10  school.  We don't see any liable reason why the

11  commission would hold to a January completion

12  date eight months prior to school starting, when

13  in previous years, or even last year, they

14  allowed other schools to open facilities that

15  were only completed the day before school

16  started.  And so we just don't see that that is

17  was a material change or a material breach in

18  the contract.  I wasn't aware of the language

19  that was agreed to or was signed by Woodland

20  Prep, but I would have become much more

21  concerned earlier on.

22      But having served in the legislator, I

23  recognize that oftentimes, the right thing to do

with statutes regarding breaches and other

2   things and oftentimes, the legislator doesn't

3   make it to the agencies that it's intended to

4   surpass.

5   Q.   Looking at the statute of this case and the

    statute talking about a material breach, to a

7   business man, such as yourself, who has entered

8   thousands and thousands into contracts, what is

9   a material breach?

10          MR. KNIGHT:  Jim, he is asking a lay

ii          witness to make a legal interpretation

12          about the interpretation and meaning of

13          the term statute as a legal conclusion

14          regarding a statute.

15          MR. DAUPHIN:  Well, I think he

16          interpreted the statute according to the

17          ordinary and common usage, and you cannot

18          get someone who knows more about a common

19          and standard usage of the contractual term

20          like this, I don't believe, than

21          Mr. Morley.

22              THE HEARING OFFICER:  Mr. Morley,

23          can you hear me?

THE WITNESS:  I can kind of barely,

2          but I can hear you.

3          THE HEARING OFFICER:  He asked you a

4          question about what is your understanding

S          as a business man about a material breach

           in this situation.

7          Can you answer that question.

8          THE WITNESS:  Well, as I read the

9          statute, it seems to indicate that

10         nonperformance or a material breach would

11         have making the contract.  And I don't see

12         how that will undermine -- not being done

13         in January would prevent the school -- the

14         commission should allow it and open in

15         August of the year.  So I don't see that

16         it meets the plain language standard or

17         probably the legislator of the statute on

18         the material breach.

19         But again, that's my opinion, and

20         I'm ready -- I do have some experience in

21         the legislation, not in Alabama but served

22         ten years as a Utah legislator and

23         recognize that sometimes those things are

not nterpreted probably, perhaps.

2          MR. KNIGHT:  And I renew my

3     objection that I made prior to the

4     testimony and move to strike.

S          MR. DAUPHIN:  And it's certainty

6     relevant to his opinion as to the meaning

7     of the Alabama statute, which is to be

8     interpreted as to its common meaning and

9     everyday usage.

10          THE HEARING OFFICER:  Well,

ii    probably would have sustained the

12    objection, but he went ahead and answered

13    the question without me being able to

14    interrupt him because of this technology

15    problem.  I am going to sustain the

16    objection.  I don't know about the motion

17    to strike

18          I will instruct all members of the

19    commissi on that this witness is not a

20    lawyer to the extent that he has given any

21    legal opinion.  As to the interpretation

22    of the law, you can just ignore that.

23          MR. DAUPHIN:  I think I asked him

what his opinion was.  I didn't ask him

2    what his legal opinion was.

3         THE HEARING OFFICER:   know what

4    you asked him, and I also know what he

5    answered.

          MR. DAUPHIN:  Well, and that's --

7         THE HEARING OFFICER:  He started

8    into his legal opinion.

9         MR. DAUPHIN:  Well, I don't know if

10   he has a legal opinion.  I know he has a

11   businessman's opinion.

12        THE WITNESS:  I am not an attorney,

13   so I don't have a legal opinion.  But in

14   reading the statute, my personal opinion

15   is that is a material broach.

16        THE HEARING OFFICER: Stop.  Stop.

17   Stop.

15        MR. DAUPHIN:  Hang  on.  It's hard

19   for you to see us, and some lawyers are

20   making objections.

21        THE HEARING OFFICER: Yes.  Next

22   question.

23        MR. DAUPHIN:  We'll move on.

Page 311

BY MR. DAUPHIN:

2    Q.    Has ACD also made it into a line of credit

3    agreement to help Woodland Prep?

4    A.    Yes, we have.

S    Q.    Okay.  And you delayed payment of rent for

a year?

7    A.    Yes, we have.  We have -- we have done

8    everything that we think we can possible to make

9    sure that the school is successful, that it

10   opens without having undue burden, and gets its

11   legs under it, and it becomes successful.  And

12   once the school is in operation and has an

13   opportunity to show it has made it past the

14   initial opening phase, it will have the

15   opportunity then, I think, to stretch its leg a

16   little and get the enrollment and start

17   getting -- what we've found, when a school faces

18   a lot of controversy and a lot of objections at

19   the beginning, once they're able to open and

20   have some time to get established, that usually

21   goes away and shows the parents what they have,

22   if they want to take advantage of a different

23   option of education in the area.  No one is

Page 312

forcing anyone to go.  And it just basically

2   helps everyone to improve as they work to

3   provide education in the best possible way.

4   Q.    ACD is committed to Woodland Prep; is that

5   correct?

A.    We could not be more committed.

7   Q.    You're not going anywhere?

8   A.    No.  I've got a significant amount of

9   investment there, and some real property there

10  that --

11  Q.    Are other financial entities that are

12  involved in charter schools, are they aware of

13  this proceeding and the continuous nature of

14  your commitment -- I'm sorry.  That's a bad

15  phrase.  Continuous nature of sustaining the

16  school even in light of the commitment that

17  you've made?

18  A.    Absolutely.  In fact, in any new state,

19  regardless of where the charter schools are

20  starting out, and gaining national recognition

21  and bond groups, banks, and others, watch

22  carefully to see if it's going to be a charter

23  friendly state.    they're going to have a

significant due process that allows for the

2  success of the school, and I'm concerned that if

3  this school is not allowed to open and that

4  those who are opposed to the charter school,

S  even though the legislator agrees and the

governor have passed laws that allows them, if

7  they can be successful, and keeping them viable

8  and particularly closing them down without any

9  real opportunity to prove themselves, I think we

10  will have a chilling effect in the future for

11  any funding for charters in the state reserve,

12  because they will be fearful.

13       Any financial institution is built on

14  stability and the ability to predict what's

15  going to happen.  And so as long as there's

16  predictability and stability in the system, that

17  might can attract.  If closing down

18  inadvertently or without what may be considered

19  due process, it could definitely have a chilling

20  effect on future funding.

21           MR. DAUPHIN:  Thank you.  The

22       attorney for the commission will have some

23       questions.

CROSS-EXAMINATION

2  BY MR. KNIGHT:

3  Q.  Good afternoon, Mr. Morley.  Lane Knight.

4  It's nice to meet you.

S  A.  Nice to meet you.

   Q.  Just to be clear, I think you were pretty

7  clear about this.  But ACD is a for-profit

8  business; correct?

9  A.  We are.

10  Q.  Okay.  You're an experienced company.

11  You've built charter schools all across the

12  United States, as I understand it?

13  A.  That's correct.

14  Q.  Okay.  And you mentioned -- you went into

15  some language in the Alabama statute.  I'm

16  assuming before you get involved in a particular

17  state, you familiarize yourself, ACD does, with

18  the laws of the applicable jurisdiction?

19  A.  We try to.

20  Q.  Okay.  And ACD very likely would have done

21  that in this case with respect to the laws of

22  Alabama prior to becoming involved with a

23  charter school?

A.   Yes, we did.  And we felt that the statutes

2   in Alabama were available to charters, and they

3   had a very good possibility of success.  And,

4   you know, oftentimes, at the beginning of the

S   movement, we know that there are bumps in the

road, and people are trying to get their legs

7   under them.  We do assume that once the charter

8   law is passed that provisions and the boards or

9   whatever types of structure is set up to oversee

10   them are going to promote them and be favorable

11   toward their success.

12   Q.   And you would have been aware in the act

13   there is a process that allows for revocation of

14   a charter contract before becoming involved with

15   Woodland Prep?

16   A.   Yes.  And the process seems to be one that

17   would provide the due process and a stable **and**

18   secure environment predictable, which is what we

19   look for in all.

20   Q.   And S believe you said you didn't -- ACD

21   did not become financially involved with

22   Woodland Prep until there was a charter

23   contract; is that correct?

A.    That's correct.

2    Q.    Would you have reviewed Woodland Prep's

3    startup contract prior to becoming financially

4    involved?

5    A.    Yes, we did.  But we did not see the

6    amendment of the contract until well after it

7    was signed.  The amendment that was accepted

8    January 15th as the date or completion and the

9    language that it indicated that it would be a

10    material breach if it were not, and so that was

11    something that was entered into without our

12    knowledge.

13    Q.    You understand the nature of the

14    pre-opening conditions in the charter contract

15    of Woodland Prep?

16    A.    I do understand pre-opening conditions.  We

17    also understand that charters'nature or passion

18    in the state, and that typically the state has

19    no obligation other than to the kids that are

20    enrolled in the project.  So we recognize that

21    there is, unlike a lot of the district schools

22    through the state, it takes responsibility of

23    whether the school is empty or full.  The

charter school statute requires them only to

2  provide reimbursement or funding for those that

3  are actually enrolled is a great protection to

4  the state.

S  Q.   As to your comment that ACD did not become

   financially involved, I suppose that means that

7  when a commitment of money was made, that after

8  the charter contract was entered into, is that

9  what you mean by financially involved?

10  A.   That's what S mean, yes.

11  Q.   Yeah.  But ACD, in fact, was involved with

12  Woodland Prep through the application process

13  and prior to a charter contract being entered

14  into?

15  A.   We often give some counsel, or at least

16  help the school that reaches out to us

17  indicating they are trying to get a charter

18  contract and provide some counseling or some

19  experience and meet with the -- actually have

20  people on our staff that are advisors that are

21  very good in helping with the process where they

22  can.

23  Q.   Would ACD have reviewed the report by NACSA

that evaluated Woodland Prep's application?

2    A.    I did not personally, but it's likely that

3    we would have had our people review it.

4    Q.    And ACD, therefore, if they would have

5    reviewed it, they would have been aware that

6    NACSA was critical of Woodland Prep's financial

7    plan and questions its ability to meet ts

8    $500,000 fundraising target?

9    A.    Yes, I believe that's true.  I believe

10   that -- but the way that we have evaluated the

11   schools in the past, and if the school cannot

12   survive on the budget that it's provided by the

state outside of the ability to raise

14   independent capital through fundraising, we

don't take them on.  We felt that the state

16   funding were adequate, and we felt that given

17   proper coaching and time in getting enrollment,

18   that the school would be successful on the state

19   and federal funds alone, and we believe that in

20   every case.

21        If a school can't survive without outside

22   fundraising, we typically will not get involved.

23   And as we looked at the budgets, and we look at

the way that reimbursements were in the state of

2   Alabama and the federal funds that were likely

3   to be available in this particular school, we

4   felt there was adequate funding to provide

S   the -- or to provide for the education there.

So I think it's wonderful for schools to go for

7   grants. I think that's important. We would

8   encourage it and help in any way that we can.

9   But the thing in a small little community like

10   Chatom and in a rural area and lower income area

11   to raise half a million dollars to keep the

12   school alive, we would not base our decision to

13   support the school on that -- on that type of

14   assumption.

15   Q.   Who is -- is it obert -- and I may be

16   missing a letter in his name. I think his

17   name   I call him Giordano, but there may be an

18   R in there, and I'm missing it.

19   A.   It's Robert Giordano. He's -- he's an

20   employee of ours and VP of marketing.

21   Q.   Are you aware that Mr. Giordano wrote on

22   April 12, 2018, an e-mail in which he noted that

23   it was important for Woodland Prep -- and this

is a quote:     's important to have a plan to

2  raise the 250- to 400,000, thus supporting the

3  planning year and even some enrollment

4  shortages."

5  A.   I have not seen the e-mail, but  certainly

6  wouldn't fault him for encouraging them to raise

7  money and do the very best they can.  But we, as

8  a company, often provide service, and in this

9  particular case, we have already provided about

10  $240,000 in startup capital for the employment

11  of Dr. Walters and for the enrollment and to

12  basically help the school to get started.  So in

13  the event that they are unable to make those or

14  raise those funds, we stand ready to assist and

15  help them get to where they need to be.

16  Q.   Well, doesn't that suggest to you -- isn't

17  that inconsistent with your testimony that you

18  evaluate a school solely from an enrollment

19  standpoint without regard for the school to

20  raise any funds through fundraising?

21  A.   No, that's not inconsistent at all.

22  think it's important that the school does all it

23  can and anything that it can to reduce the

financial burden.  I'm just saying that we don't

2  underwrite it based on the fact that they're

3  going to raise that, because we recognize it's

4  very unlikely in most cases that they will.

S  Q.   Are you aware of -- that Woodland Prep has

not met its fundraising goals?

7  A.   I am.

8  Q.   Okay.

9  A.   It's pretty hard to meet those fundraising

10  goals with the things that they've been asked to

11  carry.  I mean, they've been under scrutiny and

12  have had all kinds of local issues as well as a

13  pandemic and a lot of other things that have

14  been atypical of any school, and I think most

15  would struggle under their current

16  circumstances.

17  Q.   ACD was involved with Woodland Prep's

18  request for an extension to extend their opening

19  date from August 2019 to August 2020; correct?

20  A.   We know of it.  I don't know how involved

21  we were in being there, but certainly, we were

22  aware of it and supported it, yes.

23  Q.   There was a June 7, 2019, commission

meeting.  I take it that you did not attend that

2  meeting personally.

3  A.    I did not.

4  Q.    Have you attended any meeting of the

S  Alabama Charter School Commission?

A.    I have not.

7  Q.    Are you -- have you read the minutes from

8  the June 7, 2019, commission meeting?

9  A.    No, I have not.

10  Q.    Okay.

11  A.    That would be something that our staff

12  would look at, but I was not aware of it, no.

13  Q.    Okay.  Was ACD aware of the community

14  opposition issue prior to its involvement in

15  assisting Woodland Prep and asking for an

16  extension of the opening date of its school?

17             MR. DAUPHIN:  Object.  That's

18        like

19  A.    We became aware of the community issues

20  about that time; maybe a little earlier than

21  that, yes.  And we were aware of the community

22  opposition and felt it would be really unfair.

23  Found it to be discriminatory, and frankly, we

were a bit disturbed that it was allowed to go

2   along the way it was and has continued to go on.

3   In 2020, it's unfortunate to have that kind of

4   issue going on in the United States of America.

S   Q.   Was ACD aware of the risks that it was

taking in the school in light of the opposition

7   that the school would be built, and it would not

8   have sufficient enrollment to support the school

9   at that time?

10  A.   We were absolutely wining to stand with

11  the school to ensure that it got the enrollment.

12  Whether it took a year, took two years, it took

13  three years, we would be there to support the

14  school.

15      What we weren't aware of nor were we

16  guess, I think, we were concerned about before

17  they even have a chance to open and approve

18  themselves, that they would be closed down and

19  not be able to have that opportunity.  We

20  believe in this school.  We feel like at this

21  time and this first year, they w 11 be under

22  enrollment.  I don't know of any school that is

23  comfortable about this coming year, because of

Page 324

the COVID-19 and the ongoing type of instruction

2    that they have to do at the end of this year,

3    but schools across the country being closed

4    down, community events being  canceled.  It's a

S    tough time across the country.  But we're

prepared to stand with the school.  If the

7    school is under enrolled this year, we believe

8    they will be able to open and perform and be

9    able to show what they can do.  That enrollment

10   will come in, say, in the next year or two, and

11   they will be able to be successful.

12   Q.   You will agree there's some amount of

13   speculation with that position, though; correct?

14   A.   It may be a bit of optimism, but it

15   certainly doesn't come without a great deal of

16   experience.  We've had experience in this area

clear across the country.  And, yeah, there

18   might be some speculation there, but we're

19   moving to put millions of dollars behind that

20   speculation and say you let us open, let us

21   perform, and we'll show you a good school.

22   Q.   I want to read an excerpt to you from the

23   minutes of the June 7, 2019, commission meeting.

This is Ixhibit C49 that's been pre—admitted.

2    Henry Nels on, who is chairman of the

3  commission, asked whether they were willing to

4  take a $6 million risk of building a school and

5  no one enrolled.  Soner Tarim stated, yes,

6  American Charter Development was willing to take

7  that rest.

8    Henry Nelson stated that was a high risk.

9  A representative from the American Charter

10 Development stated that they do this work all

11 over the country, and they've seen this before.

12    Do you agree with that statement?  Was

13 American Charter Development aware of the risks

14 and willing to take it?

15         (Brief interruption.)

16 A.    Can you hear me?

17 Q.    We can now.  We did not hear your response.

18 A.    Okay.  I'm sorry.  Yeah.  Every school we

19 have developed has the risk of failure.  We

20 don't have anybody that had deep pockets.  It's

21 a nonprofit small group with no personal

22 guarantee.  So, yes, we are aware of the risks,

23 and we have had the schools where we have had to

feed them and provide extra funding for years,

2  for a couple of years, and so, yeah, we're aware

3  of that.  All we're asking for is the

4  opportunity to open and the opportunity to take

S  that risk, rather than having the building

sitting empty with no kids in them.  And if we

7  open with 50 kids, 100 kids, we'll take that

8  risk, and we'll stand by it and make sure the

9  school is open to perform every day.

10      So, yeah, we are familiar with the risks.

11  I would think that we are a lot more familiar

12  with the risks than anybody else there, because

13  we have done it 100 times across the country,

14  and sometimes we're not as successful at getting

15  them opened as we would like to be.  But one

16  thing we are good at is staying with it and

17  ensuring that they're successful over the long

18  haul.

19  Q.   And in this case, the risk came to fruition

20  in the sense that enrollment is not what

21  Woodland Prep or American Charter Development

22  expected or hoped for; correct?

23  A.   Obviously, there have been -- we're dealing

with schools from California to Florida and the

2    Carolinas.  All of them are concerned about

3    enrollment, because at the end of this year,

4    they have had a difficult time getting out in

S    the community and enrolling and even

     reenrolling, and parents are a little frustrated

7    and don't have a clear understanding of what is

8    coming next year.

9         Are we going to be delayed?  Are we going

10   to be online learning again?  Are we going to be

11   open for business?  This is a pandemic like none

12   of us have ever seen, and so all of us are up in

13   the air.  We have a lot of concerns across the

14   country, but we are resilient as Americans.  We

15   don't hide and cower from these opportunities.

16   We just do the best we can and move forward and

17   believe this next year is going to be a tough

18   one.  Then we will make it through and move on

19   and ensure that we're able to get enrollment in

20   the future.

21   Q.   You're aware in this case, given the

22   enrollment numbers, that Woodland Prep will be

23   operating at a budget deficit for the year?

A.   I am aware that they're going to be

struggling with an under enrollment.  And, yes,

I'm assuming that they will have budget deficit.

**We will** wor          em closely on their budget

and help them with the budget process.  If they

are not paying rent, which is typically

somewhere between 18 and 20 percent of their

total gross revenue, that can go right in their

salaries.  That will be able to adjust based on

the number of students that they do have

enrolled.  And so, yeah, we understand that

there is going to be some budget shortfall, and

we are there to help them, and I think we have

made that pretty evident by waiving or deferring

their lease and giving them a line of credit to

draw on.

Again, we recognize that there is nothing

magic that is going to come back and pay us back

for lines of credit and loans.  We have had to

write off a lot of loans, because the fact is

there's no check unless the school is

successful.  We are the ones taking the

financial risk.  We are the ones that are

investing in Alabama, and in this particular

2   case, in a little rural county that really could

3   use the opportunity to have parental choice.

4   Q.   And the line of credit is the one that you

5   recently extended $1 million line of credit to

Woodland Prep; correct?

7   A.   Yes.

8   Q.   Okay.  Okay.  And that's a -- that's not a

9   grant.  That's not fundraising.  That is a loan

10  that carries an interest rate; correct?

11  A.   That's the intent, yes.

12  Q.   And what is the interest rate on that loan?

13  A.   Honestly, Z think it's 5 percent to start

14  with, and then it goes up to our regular rate of

15  about eight and a half.  But S was out of town

16  when that was put together by my attorney, so

17  may be wrong.  But that's what my understanding

18  was.

19  Q.   The last thing I'm going to ask you is:  No

20  one from Woodland Prep or ACD or Lucida

21  Construction has been able to assure and verify

22  to the commission that a school was going to be

23  operational with a certificate of occupancy by

August 2020.  Are you equally unwilling to make

2    that commitment?

3    A.    We always look for contingency plans if the

4    building is not going to be completed, but I

S    don't see any reason why the building won't be

     completed.  We have had issues in the past with

7    rain.  Once they get the roof on that, then we

8    should be all inside except for the final paving

9    on the exterior.  It's all in play.  We know

10   it's been a difficult run and have put a lot of

11   effort into trying to stage the exterior

12   constructions.  But I think we're in a pretty

13   good position at this point to pretty much get

14   the project down without having to rely on a

15   stretch of good weather.  So I am confident we

16   *will* get her done.

17   Q.    If there is no building that is operational

18   by August 2020, do you know of any plans?  What

19   will happen to the students who are enrolled who

20   show up to go to school?

21        Do you have any idea of that?

22   A.    We have talked a little bit about the

23   contingency plan, but this hearing is the

pivotal thing.  I mean, it's pretty hard for a

2   school to focus on plans and hiring and on

3   getting the kids in the school and on promoting

4   when most of the opposition is to counting that

S   there is not going to be a school.

MR. KNIGHT:  That's all the

7   questions I have.  Thank you very much o

8   your time, Mr. Morley.

9   THE WITNESS:  You're certainly

10   welcome.  Thank you.

11   MR. DAUPHIN:  Mike, I don't have any

12   others other questions.

13   MS. WILLIAMS:  I have two questions,

14   sir.

15   THE HEARING OFFICER:  Come on up to

le   the table.

17   MS.WILLIAMS:  Hello, Mr. Morley.

18   I'm Lisa Williams.  I'm one of the

19   commissioners for the charter commission.

20   THE WITNESS:  Hi

21   M.S. WILLIAMS:  I have experience in

22   charter schools.  Washington County

23   residents have sent me numerous e-mails.

I read them all.  And I grew up in a

2    setting like Washington County.  I worked

3    with students who are in charter schools

4    across the state of Arkansas, students who

5    lived in a Delta, so I know what a charter

school can do for children.  But we're all

7    kind of perplexed.

8         Why would American Charter

9    Development risk $7 million for the people

10   of Washington County whom they do not

11   know?  Why would you do it?

12        THE WITNESS:  We do it because we

13   believe in the cause of charter schools.

14   We believe that charter schools can change

15   lives.  We believe that particularly in

16   areas like Washington County, where they

17   have no other options other than what's

18   provided in this district school.  I'm not

19   saying the district schools are bad.  It's

20   just that our experience is that having

21   other options benefit everybody, including

22   the district.  It gives them an

23   opportunity to see other things that might

or might not work.  Having a choice is an

2      important thing in my philosophy and my

3      philosophical belief.

4           And, yeah, it would have been

5      smarter for us to go to a larger area

       where we would have less controversy, and,

7      you know, sometimes I think why we didn't

8      take this to Alabama.  I do.  But we

9      believe in the movement, and we believe

10     that Washington County will be the better

11     for having a charter school there.

12          MS. WILLIAMS:  Okay.  Thank you.

13          And the last one.  Do you know what

14     the outcome of the students are who on

15     average in an American Charter Development

16     charter school, where you have invested in

17     that charter?  How did the outcome compare

18     to the state outcome academically?

19          THE WITNESS:  Well, if we're not

20     exceeding the state outcomes or at least

21     the peer outcomes, we're disappointing,

22     and we look to see how we can improve

23     them.  We're not in a competition to t y

to beat anyone.  We feel like it's

2      important that our school performs well

3      and provides an education for kids that is

4      superior to what they're going to get

5      anywhere else, and we also succeed in

       that.  But we are not satisfied until

7      do.

8           And so if there are -- if we're

9      below standards, then we're constantly

10     working with the school to see how we can

11     bring that standard up and perform better.

12     I'm not saying that the district is not

13     doing the same thing.  Everybody ought to

14     be doing the same thing.  You know, I was

15     livid.  I was called in in the state of

16     Arizona, so it doesn't apply to you guys,

17     by a district superintendent who wanted to

18     sponsor a charter school, and they made it

19     where they could have been authorizing

20     down there, and they were in a very rural,

21     very lower performing district, and he

22     made the comment to me on one occasion

23     that these kids are the kids.  You're

never going to get better out of them.

2   Because they're just these kids. And I

3   thought to myself right there and then, I

4   don't want to work with you. I have no --

5   I can't imagine that the district

6   superintendent would call his students

7   these kids.

8       I ensure that kids in that district

9   that could be A kids and could perform

10   with the best of them, but with that

11   mentality, it will never happen.

12   thought right there and then we train A

13   kids, and we are there for A kids. And

14   when we put together a school, it's on the

15   assumption that everyone can be an A kid,

16   and that's what we are about.

17       MS.WILLIAMS: Okay. Thank you,

18   Mr. Morley. I appreciate it.

19       THE WITNESS: You bet.

20       THE HEARING OFFICER: Thank you,

21   Mr. Morley.

22       THE WITNESS: Thank you.

23       MR. DAUPHIN: That's all we got.

THE HEARING OFFICER:  All right.  I

2        take, you rest.  Is that the conclusion of

3        your testimony?

4            All right.  Closing statement,

5        gentlemen?

            I'm not pressing you.  I'm just

7        asking do you want to make any closing

8        statements?

9            MR. DAUPHIN:  Just briefly.

10            THE HEARING OFFICER:  All right.  **If**

ii        one wants it, then you all get it.  I

12        think that goes to you, Mr. Knight.

13            MR. KNIGHT:  All right.  Well,

14        won't be long.

15            I think I stated the reason we are

16        here at the beginning, the standard that

17        was to apply.  You have heard the

18        evidence.  It's now the commission's job

19        to make their decision in accordance with

20        the applicable legal standard and the

21        evidence that has been presented today.

22            And I do appreciate everyone being

23        here, and I appreciate everyone's time in

giving both sides, you know, a full and

2      fair treatment in listening and

3      participating, and so thank you for that,

4      and I'll turn it over to Mr. Campbell.

S           MR. CAMPBELL:  Thank you all for

       your time.  I know it's been a long, hard

7      day for everybody.  I have the utmost

8      respect for everybody hear, including

9      Mr. Knight, Mr. Hampton.  It's been a

10     pleasure, even though it's been a very

11     awkward hearing.  I just wanted to remind

12     everybody we do have a standards and

13     charters law and charter contract.

14          I just hope that all of the activity

15     that's been put in this procedure and our

16     contract in Woodland Prep is ignored, and

17     just the bottom line of the law is the

18     issue to focus on, and that's why the

19     decisions are made.

20          Thank you.

21          THE HEARING OFFICER:  Mr. Dauphin?

22          MR. DAUPHIN:  First off, thank you

23     for your attention, and thank you for your

attention.  It's given Woodland Prep and

2  the board members the opportunity to come

3  to you and say we want this school, this

4  is why we want this school, and it's given

S  an ACD the opportunity to tell you we're

going to be there, and we're going to

7  support them every way we can.

8  Don't let a technicality over

9  opening  in January be a decision on

10  whether this school opens or not with all

11  the work these people have put in and

12  everybody that's standing behind it.

13  That's not material.  That's just not

14  fair.  And we appreciate the opportunity

15  to present this to you, and it's your

16  decision, and it's up to you what happens

17  to the children in Washington County and

18  whether they have this opportunity.

19  Zf given this opportunity, that

20  school is going to open, and everything is

21  going to go into it that they can.  Don't

22  let -- and I'll just say naysayers --

23  don't let them win this battle.

Thank you.

2        THE HEARING OFFICER:  All right.

3   Ladies and gentlemen, I have a couple of

4   things I need to say to you, and I may let

5   the attorneys chime in and interrupt me.

But it's a couple of things I need to

7   express to you that you need to know.

8        Here, I'm speaking to the

9   commissioners themselves.  The eight of

10  you who have participated in this hearing

11  are going to deliberate at some point and

12  make a decision about this case.

13  very important that you listen to what I

14  have to say and think about these things

15  that I'll instruct you on.

16        Specifically, I am informed by the

17  attorneys that they agree that y'all will

18  not deliberate today.  We have a regularly

19  scheduled meeting on June the 9th, as I

20  understand.  It's been noticed that part

21  of the process is taken care of.  So

22  unless you want to have some objection, my

23  understanding is y'all will take this